UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

EVALETTE TUCKER,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 18-cv-01861-RMI

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 24

Plaintiff seeks judicial review of an administrative law judge ("ALJ") decision denying her application for supplemental security income under Title XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 10 & 19), and both parties have moved for summary judgment (dkts. 18 & 24). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

**LEGAL STANDARDS**

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108

F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On March 20, 2014, Plaintiff filed an application for supplemental security income under Title XVI, alleging an onset date of July 1, 2013. *See Administrative Record*[1] *"AR"* at 33. The ALJ denied the application on September 23, 2016. *Id.* at 42. The Appeals Council denied Plaintiff's request for review on September 12, 2017. *Id*. at 13-16.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff's application for Title XVI benefits alleged disability due to: lower back pain and back of neck pain; gout; edema; paresthesia; numbness; hypertension; undiagnosed head/nervous system, fluid pressure/tingle; undiagnosed cardiovascular systems chest pain; ovarian cysts; neck spasms; chronic pain; and palpitations. *AR* at 189-90. The ALJ found the following conditions are severe: gout; chronic pain syndrome; edema; gallstones and pancreatitis status post cholecystectomy; ovarian cyst; hypertension; and obesity. *Id*. at 35. In this court, Plaintiff assigns error to the following findings: Plaintiff's anxiety and cardiac conditions are non-severe; Plaintiff's conditions do not meet or equal an impairment listing; the ALJ's evaluation of the medical record; the ALJ's assessment of Plaintiff's residual functional capacity; and the ALJ's determination of Plaintiff's credibility. Pl.'s Mot. (dkt. 18) at 2, 7-19.

<u>Medical Evidence from Treatment Providers:</u>

Beginning in 2013, Plaintiff had frequent doctors' appointments and emergency room visits for various complaints including anxiety and cardiac issues such as palpitations and chest pain. *AR* at 430-433; 503-512;670-680; 753-759; 784-785; 942-943. On August 29, 2013, Plaintiff

---

[1] The AR, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #14. *See* (dkts. 14-1 through 14-23).

was treated at St. Joseph's Emergency Room and four hours later called 9-1-1 to be transported to Dameron Hospital Emergency Room due to an anxiety attack. *Id*. at 712. During the visit at Dameron Hospital, it was noted that Plaintiff had a history of hypertension and "anxiety and has been off her medication for the past week." *Id*. That month, Plaintiff's primary care provider – Dr. Sou Her – diagnosed Plaintiff with anxiety and prescribed Buspar. *Id*. at 406-07. Around this time, Dr. Jacqueline Craig treated Plaintiff for hypertension and counseled her to continue taking medications for high blood pressure and that failure to do so could damage her arteries and lead to heart disease or stroke. *Id*. at 807. In September of 2013, Plaintiff was seen at Lodi Memorial Hospital where she was told she had anxiety. *Id*. at 808. At a follow up visit at Golden Valley Health Care Centers, Plaintiff complained that "a cat bite 3 years ago has been affecting her body by giving her joint pain." *Id*.

From December 2013 to January 2014, Plaintiff was seen at Pacific Urgent Care where she was once again diagnosed with anxiety and consistently had abnormal mental exams. *Id*. at 762-800. During a visit at Pacific Urgent Care, Lori Long PA noted that Plaintiff "rambles all over the place, tried to discuss anxity (sic) with [patient] and history of the sam (sic)." *Id*. at 765. Plaintiff responded that she had been diagnosed with anxiety several times and "thinks that she has been labeled." *Id*. PA Long told Plaintiff that her diagnosis and those of others "came without [Plaintiff] telling [them] she was previously diagnosed." *Id*. However, Plaintiff did not want to answer questions or discuss that some of her symptoms were related to anxiety and further stated that prior anxiety diagnoses were wrong. *Id*. Additional medical providers diagnosed Plaintiff with anxiety and suggested treatment, but Plaintiff refused to accept the possibility of psychiatric diagnosis because she did not want to be labeled with anxiety. *Id.* at 414-15, 712, 801, 808-10.

In April of 2014, Plaintiff went to Dameron Hospital because she had "intermittent chest heaviness" for four to five days and complained of "fluid that goes from her lower back to her scalp causing increased pressure." *Id*. at 656. Plaintiff was diagnosed with "chest pain – non cardiac" and instructed to follow up with her primary care physician." *Id*. at 661. On April 30, 2014, Plaintiff was admitted at St. Joseph's Medical Center for burning chest pain for one month; Plaintiff also complained of "some kind of poison in her system that causes her edema and fluid

3

goes to her head and she swallows it back and it's rotting her organs." *Id*. at 732. Within one month, Plaintiff was seen at St. Joseph's Medical Center four times. *Id*. at 732-41. At the fourth visit, on May 31, 2014, Dr. Cordray recognized Plaintiff, and Plaintiff "got angry when [she] talked to [Plaintiff] about this and left threatening to call the State Board." *Id*. at 740. As late as March of 2015, Plaintiff presented with "anxious mood and affect" and "became upset when asked about psychiatric history." *Id*. at 1023-24.

In August of 2014, Plaintiff was referred to Pacific Heart and Vascular for an evaluation of chest pain. *Id*. at 753. There, Dr. Randhawa observed that Plaintiff's EKG showed a T-wave abnormality and her echocardiogram revealed diastolic dysfunction, mild mitral regurgitation, and mild pulmonary hypertension. *Id*. Based on these results, Dr. Randhawa suggested that Plaintiff try a non-physical stress test, but Plaintiff declined due to concerns about side effects from the medications used to elevate her heart rate. *Id*. at 755. Dr. Randhawa diagnosed Plaintiff with unspecified chest pain, hypertensive heart disease, pulmonary hypertension, and mitral regurgitation. *Id*.

The following year, Plaintiff's primary care physician referred her to a cardiologist – Dr. Ramin Manshadi. *Id*. at 1228. On May 19, 2015, Plaintiff had her first visit with Dr. Manshadi, and he noted Plaintiff had been having chest pains since 2013 which had worsened. *Id*. Dr. Manshadi saw Plaintiff for most follow-up visits except for two visits with Rex Ambatali – a nurse practitioner at Manshadi Heart Institute. *Id*. at 1228-30, 1231-32, 1233-35, 1237-38, 1253-54. Dr. Manshadi reviewed and signed off on all medical reports from follow-up visits including those conducted by NP Ambatali. *Id.* at 1272-74. Under Dr. Manshadi's care, Plaintiff underwent several cardiac evaluations including electrocardiogram, echocardiogram, and thyroid-stimulating hormone tests. *Id*. at 1225-27, 1246, 1260-61, 1264-66, 1270-71, 1275. These tests revealed Plaintiff has frequent PVCs, T-wave abnormalities, and marked rhythm irregularities. *Id*. at 1238, 1261, 1268. As a result, Dr. Manshadi diagnosed Plaintiff with palpitations, chest pains, edema, and atherosclerosis of native arteries of the extremities with intermittent claudication. *Id*. at 1232. On December 18, 2015, Dr. Manshadi noted that "[c]hest pain can be . . . secondary to stress or anxiety." *Id*. at 1234. In 2016, Dr. Manshadi prescribed beta blockers to treat Plaintiff's significant

4

cardiac arrhythmia and palpitations. *Id*. at 1222. On February 29, 2016, NP Ambatali recommended that Plaintiff "elevate or recline [her] legs [in] the daytime when possible and elevate legs at night… [and] [a]void prolonged periods of standing or walking… [and] use compression stocking as needed especially [in] daytime." *Id*. at 1272-74. Two days later, Dr. Manshadi electronically signed NP Ambatali's medical report. *Id*. at 1274.

*Reports of Non-Examining Consultants:*

Non-examining state agency medical consultants – Dr. Talcherkar and Maria Rehrig – found that Plaintiff's physical impairments are not severe. *Id*. at 194-98, 200-08. In the initial disability determination explanation, Dr. Talcherkar noted that Plaintiff did not allege anxiety in her application for disability benefits, but Plaintiff had a medical history of anxiety. *Id*. at 196. Dr. Talcherkar opined that there was "insufficient evidence to substantiate the presence of a disorder." *Id*. Dr. Talcherkar reported that when Plaintiff was contacted about the medical history of anxiety, she denied any medication or other treatment; denied that the anxiety precluded her from working; and denied any cognitive limitations. *Id*. Dr. Talcherkar's report did not address any cardiac issues. *See generally Id*. at 189-98. Thus, Dr. Talcherkar determined that Plaintiff's impairments did not significantly limit her physical or mental ability to do basic tasks. Seven months later, Dr. Rehrig conducted a reconsideration of the initial disability determination explanation in light of new medical records. *Id*. at 200-08. The additional records included four new reports all of which predated Plaintiff's treatment with Dr. Manshadi. *Id*. at 202. Based on that record, Dr. Rehrig affirmed the initial evaluation. *Id*. at 206.

*Function Reports:*

Plaintiff stated her pain began in 2013 and that the pain was located in her head, neck, face, chest, abdomen, legs, feet, and arms. *Id*. at 316. Plaintiff stated that the pain occurred daily, and nothing specific triggered the pain. *Id*. When the pain occurs, it lasts for many hours. *Id*. Plaintiff reported that rest makes the pain somewhat easier to deal with. *Id*. Plaintiff took medicine daily to control the pain with some relief. *Id*. She explained that the medication upset her digestion and caused her head to "puff[] up" and tingle a lot. *Id*. at 317. She also attempted to reduce the pain by walking less, using heating pads for her neck, and wrapping her feet and using an arm sling for

5

1  gout-related pain. *Id*. Plaintiff reported that her pain significantly interfered with her daily life. *Id*.
2  She no longer had a social life because it was too painful to go to church, graduate school, or
3  participate in events with her children. *Id*. She stated that her daily activities "are set on staying
4  alive and taking care of her child." *Id*. Plaintiff plans her days around the pain and lays or sits
5  down for hours because of the pain. *Id*. However, she responded to the questionnaire that she
6  could run errands when she had some relief from the pain; walk a few feet outside her home;
7  stand for 20 minutes at most, but not at all when the pain is severe; sit but must change positions
8  often due to pains; drive her vehicle with limitations because of the pain; and do light
9  housekeeping chores when the pain subsides. *Id*. at 318. She requires assistance for cleaning,
10  laundry, cooking, vacuuming, mopping, and dusting when the pain is severe. *Id*.

*Hearing Testimony:*

At the hearing, Plaintiff stated that she stopped working in 2012, and began seeing doctors in 2013. *Id*. at 148, 152. Plaintiff stated that she dropped out of graduate school due to the pain. *Id*. at 152. Her chief complaint at the time was gout and edema. *Id*. at 154. Plaintiff testified that the gout caused her significant pain, and pain medicine did not significantly relieve the pain. *Id*. at 155. She also stated that her edema was constant with days that were worse than others. *Id*. at 158. Plaintiff took pain medication to treat the pain but did not receive preventative medicine or specific treatment for gout or edema. *Id*. at 155, 158. Plaintiff testified that she had heart palpitations and her heart "moves in [her] chest." *Id*. at 161. She stated that "the PA at Manshadi's … office told [her] … [she] needed to start exercising," but she could not because of generalized pain and heart pain. *Id*. at 163. Plaintiff was prescribed Coreg for heart palpitations. *Id*. at 165. At the hearing, Plaintiff stated that she requires the assistance of her teenage daughter to perform daily activities. *Id*. at 168-69. Plaintiff testified that she is only able to walk about a block due to pain, and that she is unable to exercise due to pain. *Id*. at 155, 160, 175, 316-18. She wears compression socks and uses a cane to walk. *Id*. at 176-77.

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically

6

determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[2] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* at 33-42. At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 35.

At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: gout; chronic pain syndrome; edema; gallstones and pancreatitis status post cholecystectomy; ovarian cyst; hypertension; and obesity. *AR* at 35.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four.

---

[2] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

7

*See id.* § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* at 37. Next, the ALJ determined that Plaintiff retained the RFC "to perform light work with some postural and environmental limitations throughout the period under consideration." *Id.* at 37-40.

At Step Four, the ALJ determined that Plaintiff is capable of performing the equivalent of her past relevant work as a Merchant Patroller; or, in the alternative, Plaintiff could work as a Cashier II, Mail Clerk, or Toy Assembler. *Id.* at 42. Lastly, at Step Five, the ALJ concluded that based on the RFC for the full range of light work, that Plaintiff had not been under a disability, as defined in the Social Security Act, from date July 1, 2013, through the date of the issuance of the ALJ's decision, September 23, 2016. *Id.*

**ISSUESS PRESENTED**

Plaintiff presents five issues for review claiming that the ALJ made the following errors: finding Plaintiff's impairments non-severe; finding Plaintiff does not meet or equal a listing; evaluating the medical opinions; assessing plaintiff's residual functional capacity; and determining Plaintiff's credibility. Pl.'s Mot. (dkt. 18) at 2, 7-19.

**DISCUSSION**

Plaintiff argues that the ALJ erred in finding that her anxiety and cardiac conditions were not severe. *Id.* at 8-11. As to the cardiac condition, Plaintiff argues that the core of the ALJ's error is that the ALJ failed to properly consider the cardiac tests and failed to assign any weight to, or consider the opinion of, treating cardiologist Dr. Manshadi. *Id.* at 8-9, 15-16. Defendant responds that the ALJ correctly found that the tests were essentially normal; and that nurse practitioner Ambatali's findings and recommendations could not be attributed to Dr. Manshadi and thus not an opinion from an acceptable medical source. Def.'s Mot. (dkt. 24) at 3-5, 11.

Regarding the medical evidence, "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant . . . [T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010) (quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)). The reason that an ALJ must

accord special weight to a treating physician's opinion is that a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). If a treating source's opinions on the issues of the nature and severity of a claimant's impairments are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." 20 C.F.R. § 404.1527(c)(2).

Generally, a nurse practitioner is not an accepted medical source. *See Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). Instead, nurse practitioners are defined as "other sources" whose testimony may be discounted by an administrative law judge if they "give[] reasons germane to each witness for doing so." *Id*. However, "a nurse practitioner working in conjunction with a physician constitutes an acceptable medical source, while a nurse practitioner working on his or her own does not." *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996) (noting that the nurse practitioner was an acceptable medical source because he acted as an agent of the treating physician, regularly consulting with and working closely under the supervision of the treating physician); *cf. Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015) (finding that the nurse practitioner was not an acceptable medical source because he did not work closely with any physician and his opinion contradicted the medical opinion of a treating physician).

Plaintiff presented medical evidence showing consistent treatment for cardiac conditions from the Manshadi Heart Institute for a one-year period. *AR* at 1222-1275. In May of 2015, Dr. Manshadi treated Plaintiff for chest pain and heart palpitations. *Id*. He evaluated Plaintiff's heart function by a heart monitor that revealed frequent PVCs. See *AR* at 1261. Other diagnostic tests revealed T-wave abnormality and marked rhythm irregularity. *Id*. at 1268, 1273. The ALJ, however, did not acknowledge these test results but rather focused on tests that "were essentially normal" by other providers. *Id*. at 35-36. Defendant likewise ignores these tests and points to tests by other providers to argue that the ALJ's finding was supported by substantial evidence. Def.'s Mot. (dkt. 24) at 3-5. It was error for the ALJ to ignore these exams.

Additionally, over that one-year period, Plaintiff had several visits with Dr. Manshadi, and

9

United States District Court
Northern District of California

follow up visits were rotated between Rex Ambatali, NP-C and Dr. Manshadi. *AR* 1228-30; 1231-32; 1233-35; 1237-38; 1253-54. In fact, NP Ambatali saw Plaintiff on two occasions, and Dr. Manshadi conducted all other visits. *Id*. At one of the two visits conducted by NP Ambatali, he recommended that Plaintiff "elevate or recline [her] legs [in] the daytime when possible and elevate legs at night . . . [and] [a]void prolonged periods of standing or walking . . . [and] use compression stocking as needed especially [in] daytime." *Id*. at 1272-74. The ALJ gave this opinion "little weight because Mr. Ambatali is not an acceptable medical source." *Id*. at 40. In support of this finding, Defendant argues that "Dr. Manshadi did not sign off on the note to endorse Nurse Ambatali's recommendation, so Plaintiff's attempt to attribute the note to Dr. Manshadi is unfounded." Def.'s Mot. (dkt. 24) at 11. As stated above, however, Dr. Manshadi reviewed and signed all medical reports including those created by NP Ambatali.[3] Additionally, NP Ambatali worked at the Manshadi Heart Institute; and there is nothing in the record that shows a contradiction between Dr. Manshadi's and NP Ambalati's medical opinions. Thus, NP Ambalati worked closely under the supervision of Dr. Manshadi, and his medical opinions can be considered a medically acceptable source. Nonetheless, the ALJ rejected NP Ambatali's medical opinions and recommendations and did not discuss Dr. Manshadi's opinions at all. On remand, the ALJ should consider the medical opinions of Dr. Manshadi and NP Ambatali.

Plaintiff also argues that the ALJ erred in finding that her anxiety condition was not severe because it failed to meet the durational requirement. Pl.'s Mot. (dkt. 18) at 9-10. Defendant responds that the ALJ reasonably concluded that the record did not evidence long-term anxiety. Def.'s Mot. (dkt. 24) at 6.

While it is true that it is incumbent on claimants to provide sufficient medical evidence of one or more disabling impairments, it has "long [been] recognized that the ALJ is not a mere umpire at [an administrative proceeding], but has an independent duty to fully develop the record[.]" *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992, as amended Sept. 17, 1992) (*per curiam*); *see also Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are

---

[3] It is noteworthy that, as of 2017, nurse practitioners are now an acceptable medical source. *See* 20 C.F.R. §404.1502(a)(7).

inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). The ALJ has an obligation to take reasonable steps to ensure that issues and questions raised by medical evidence, particularly evidence from treating physicians, are addressed so that the disability determination is fairly made on a sufficient record of information, be it favorable or unfavorable to the claimant. *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); and, *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978); *see also* 42 U.S.C. § 421(h).

        The ALJ has not only the power, but the duty, to "conduct an appropriate inquiry" if the evidence is ambiguous or inadequate to permit a proper evaluation of a claimant's impairments. *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). If evidence from a medical source is inadequate to determine if the claimant is disabled, an ALJ may be required to re-contact the medical source, including a treating physician, to determine if additional needed information is readily available. *See* 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1); *see also Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) ("[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence [or] the ALJ's own finding that the record is inadequate"). The responsibility to fulfill this duty belongs entirely to the ALJ; it is not part of the claimant's burden. *See e.g., White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("This duty extends to the represented as well as to the unrepresented claimant . . . The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests. Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry . . . including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.").

        Here, it cannot be reasonably said that the ALJ discharged the "duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 110-11. The ALJ found "little objective medical evidence to support that this condition has lasted or can be expected to last for a continuous period of not less than 12 months." *AR* at 36-37. Although the

ALJ acknowledged that the "treatment records covering the period from August 2013 to April 2014 documented anxiety," he found there was little evidence about the condition after this period. *Id*. Thus, Plaintiff's anxiety was found non-severe. *Id*. Defendant submits that the ALJ's finding was reasonable because the Plaintiff presented no more than nine months of evidence documenting anxiety. Def.'s Mot. (dkt. 24) at 6. Defendant, ironically, notes that Plaintiff presented records from December 2015 – a time outside of the nine-month period – in which Dr. Manshadi noted that her chest pain could be due to anxiety. *AR* at 1234. Additionally, medical records indicate that Plaintiff presented with anxious affect in March of 2015. *Id*. at 1023-24.

      The ALJ provided two additional bases for finding Plaintiff's anxiety condition not severe. First, the ALJ noted that Plaintiff denied having any anxiety problem, and she stated that her mental symptoms "do not preclude her from working." *Id*. at 37. Second, the ALJ stated that the record "showed that she has received little specialized mental health treatment . . . since the alleged disability onset date" and "[t]here is no definitive evidence that she has had difficulty obtaining specialized mental health treatment." *Id*. These points made by the ALJ are consistent with Plaintiff's well-documented history of *refusing* anxiety diagnoses and treatment from several medical providers because "she does not want to be labeled with anxiety." *Id*. at 801. Despite the ALJ's own finding that Plaintiff's medical record was inadequate, he did not order a consultative examination or take other steps to develop the record to properly evaluate Plaintiff's documented anxiety. Therefore, the ALJ erred by failing to develop the record.

      Lastly, because the court is already remanding the case for further proceedings, the court does not find it necessary to address Plaintiff's remaining issues (finding Plaintiff does not meet or equal a listing; failing to evaluate the medical opinions of Dr. Bui and Dr. Her; assessing Plaintiff's residual functional capacity; and determining Plaintiff's credibility) because the claims can be adequately addressed on remand, and because neither can secure for Plaintiff any relief beyond what is already being granted. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Abdul-Ali v. Berryhill*, No. 18-cv-03615-RMI, 2019 WL 3841995, at *7 (N.D. Cal. Aug. 15, 2019); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d

12

1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 18) is GRANTED, and Defendant's Motion for Summary Judgment (dkt. 24) is DENIED. The case is remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 27, 2019

ROBERT M. ILLMAN
United States Magistrate Judge